IRVING–PITT MFG. CO. v TWINLOCK CO. (McMILLAN BOOK
CO., Intervener).

(District Court, S. D. New York. December 5, 1914.)

No. 4–147.

1. PATENTS ☞290—SUIT FOR INFRINGEMENT—PARTIES.

Where, pending a suit for infringement against a dealer in the alleged infringing article, complainant acquires all of the property and rights of defendant, the manufacturer of such article may, on intervention, ask that the suit be dismissed for want of adversary parties, or it may assume the defense, in which case the suit will be tried on its merits, notwithstanding the absence of the original defendant.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 470–472; Dec. Dig. ☞290.]

2. PATENTS ☞328—VALIDITY AND INFRINGEMENT—LOOSE-LEAF BINDER.

The Pitt patent, No. 778,070, for an improvement in loose-leaf binders, *held* not anticipated, valid, and infringed as to claims 1 to 9, inclusive, and not infringed as to claim 10.

In Equity. Suit by the Irving-Pitt Manufacturing Company against the Twinlock Company, in which the McMillan Book Company intervened as defendant. On final hearing. Decree for complainant against intervener only.

John C. Pennie, of New York City, for complainant.
William W. Dodge, of Washington, D. C., for defendant.

ROSE, District Judge. The complainant is the owner of letters patent No. 778,070, issued December 20, 1904, to William P. Pitt, for improvement in loose-leaf binders. It originally brought suit against the Twinlock Company for alleged infringement of the patent, consisting in the selling by defendant of loose-leaf books manufactured by McMillan Book Company. The New York agent of the Twinlock Company (hereinafter for brevity called "Twinlock") employed competent patent attorneys and also notified the McMillan Book Company (hereinafter referred to as "McMillan"). The headquarters of the Twinlock were in Cincinnati. Its officers apparently did not care enough for the right to sell the McMillan books to make a fight for the privilege. They accordingly offered to submit to an injunction, provided that it should not be required to account to the complainant or pay any costs. The then parties agreed on the form of the decree, which, as usual, adjudged the patent good and valid and that the Twinlock had infringed, that there should be no accounting for damages, and that no costs should be awarded to either party.

Such a decree should have contained a statement that it was entered *by consent*. Doubtless if it had actually been presented to the judge for signature, he would of his own motion have made such insertion. It is quite common for decrees agreed upon under such circumstances to be submitted, without saying on their face that they are *by consent*. The court, however, before signing them, should always be careful to require that statement to be inserted. The fact that the parties did not themselves put it in does not, to my mind,

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

show that they had any improper purpose in view. It has never been presented to the court for signature, because on the 23d of May, 1910, McMillan asked for leave to intervene to defend the suit. Over complainant's objection such permission was granted.

When the McMillan filed its answer, it charged that the suit as originally brought against the Twinlock was fraudulent and collusive, and the result of a conspiracy between the complainant and the Twinlock to injure the McMillan. Complainant moved that such allegations should be stricken out of the answer as scandalous and impertinent. Judge Noyes, before whom this motion was heard, was not, however, so satisfied of its total irrelevancy as to think it his duty to expunge it; but he distinctly refrained "from expressing any opinion upon the question whether the allegations, if substantiated, would constitute in themselves a defense to the suit or require its dismissal." This order was entered on the 7th of January, 1911. For two years thereafter nothing was done.

The McMillan then gave notice to the complainant that it proposed to take proofs on its behalf. Thereupon the complainant sought to have its case dismissed, setting forth as a reason for so doing that it found that the patent, when issued, had been issued to the Irving-Pitt Manufacturing Company, a partnership, and not to the Irving-Pitt Manufacturing Company, a corporation, which had brought the suit. The copartnership, it is true, had intended to assign all its property to the corporation; but complainant was doubtful whether it could prove that a sufficient assignment of the legal title to the patent had been made. The McMillan opposed the dismissal of the suit, and in order to prevent it stipulated that for the purpose of this case it should be taken as admitted that the title of the complainant was sufficient.

[1] All the proofs having now been taken, McMillan insists that the bill should be dismissed because of what, in its view, was the collusive character of the original suit. There is no sufficient evidence that there was any collusion in its institution, and I do not believe that there was. Courts will not hear a suit to which there are not at least two parties genuinely antagonistic to each other. I think complainant is justified in its claim that when this suit was brought there were two such parties, and that they were still such, even at the time at which the agreement for a consent decree was entered into. A number of months after the intervention of the McMillan, the Twinlock had a disastrous fire. It subsequently sold out the tangible salvage from it, together with its American patents and the good will of its domestic business, to the complainant. No decree against the Twinlock had then been made, and thereafter no decree in favor of the complainant and against the Twinlock could have been properly entered.

But before the complainant acquired any of the property rights of the Twinlock, McMillan had come into the suit. It was then in the position to do either one of two things: It could, as the intervener did in Wood Paper Co. v. Heft, 8 Wall. 333, 19 L. Ed. 379, ask that the case should be dismissed because there were no longer two parties before the court; or it could say:

"Any decree which the complainant may get against the Twinlock will prejudice my interest. It is my goods that complainant says infringe its patent. I am ready to meet that issue, and I want to. This case offers as good an opportunity as any other to do so. I will come in and defend this action on its merit."

That is the position it did take. It forced the fighting. It resisted complainant's motion to dismiss, and proceeded to take testimony. Having elected to do so, it must abide the result. The cases which it cites to the contrary are not in point. They merely recognize that it had the right to take the first alternative above stated, if it had chosen to do so. Courts of equity require complainants to have clean hands, but they are not criminal courts. They abhor forfeitures. They cannot forfeit complainant's patent, or even its right to prevent the McMillan from infringing it, merely because complainant may have sought to get a decree against Twinlock of which some unfair use might possibly have been made in subsequent litigation with Mc-Millan.

But, as already said, I do not find that complainant's hands were soiled when it came into court, or that they have since acquired anything more than the ordinary grime of litigation. McMillan commented upon the obvious failure of the complainant to press its case with vigor and energy. Such failure might have given the defendant a good reason to move for a dismissal for want of prosecution. It did not see fit to do so. What actually happened may suggest to the court the prudence of scrutinizing complainant's proofs and arguments with something more than ordinary care. It is not perceived that in the present state of the record complainant's tardiness has any other significance. The case must therefore be decided on its merits.

McMillan set up the defense of invalidity and noninfringement. The invention is for an improvement in loose-leaf books provided with a cover and hooks or rings for securing the loose leaves. The inventor was far from the first comer into this general field. Many patents for various forms of such books, or of devices to form a part of them, had preceded his. As under such circumstances is to be expected, the McMillan finds most or all of the separate elements of complainant's combination in the prior art. That, however, is unimportant, if in fact complainant has made a new and useful combination of some of these elements and in doing so has exercised what is (for want of better term) called inventive genius.

The patent says the invention has two objects: (1) To provide means whereby the hooks may be readily opened and closed by simply drawing their free ends apart or pressing them together, so that loose leaves may be readily attached, or removed when desired; and (2) to arrange the several parts of the device in such manner that they may be readily secured to the back of the cover and to each other without the use of rings or other permanent fastenings, so that, when necessary, they may be readily detached from each other and the cover to make repairs.

These results he has obtained by combining three elements: (1) A spring plate of some resilient metal, slightly curved, somewhat like the back of a book. It has its outer longitudinal edges turned in in such

a way as to form grooves into which the edges of the plates forming the second element may be placed. (2) Two hook plates, as the patentee calls them. Each of these plates supports a plurality of hooks or segments of rings so located that, when the two hook plates are placed in position, the segments when brought together will fit into each other. One of these plates has on its inner longitudinal edge a V-shaped groove, and the other a V-shaped tongue, which will fit into the groove in the other. These hook plates are of such width that when in position they are subject to a springlike pressure of the back plate. (3) A retaining plate, shaped very much like the back plate. It, like the latter, is usually, though not necessarily, somewhat curved. Its upper longitudinal edges are turned in, so that it may be fitted over the back plate and hold the hook plates and the back plate together.

When it is desired to equip a cover with such a device, the back plate is laid in position on the inner cover of the book. The two hook plates are put in, so that the V-shaped tongue fits into the V-shaped groove. A strip of cloth, with proper spaces for the hooks, is put over them, and then the back plate, which has slots cut in it to enable it to be put over the hooks, is put on. The edges of the cloth are pasted or otherwise secured to the cover. The device is then ready for use. Ordinarily the rings are in a closed position. They may be opened by the fingers, which are required to exercise force enough to overcome the spring pressure of the back plate, which may sometimes be increased by a similar springlike action of the retaining plate. As the rings are opened the inner edges of the hook plate, held together as they are, constitute a hinge or toggle. As the rings open, the inner edges of these plates rise upward until their further progress is arrested by the retaining plate. In that position the pressure of the spring plate holds them firmly until the fingers, by moving the rings toward each other, reverse the operation.

The patent says that the novel features of the invention reside in a pair of interlocking plates, which carry the hooks and hold them in an opened or closed position, a spring plate which reliably holds the hook plate from accidental movement when the hooks are in an open or closed position, and a retaining plate which holds the hook plate and spring plate together.

It will serve no useful purpose to review any of the many patents which the McMillan puts in evidence. Suffice it to say that I do not find in any of them any anticipation of the combination which is described and claimed in the patent in suit. It is useful and has gone into large use. It has in practice superseded the various devices which were on the market when it was offered to the public. A good deal of its success may be due, as the McMillan says it is, to the skill and energy with which its sale has been pushed, and to the fact that similar qualities have not been at the command of its competitors. Nevertheless, it has merits sufficient to account for its popularity. It weighs little. It has few parts. It cannot easily get out of order. It is sightly in appearance.

The patent has 10 claims. Nine of these relate to the construction of the metallic parts of the device. The tenth is for the combination claimed in the first nine, with the added element of a strip of cloth

arranged with its central portion interposed between the spring plate and the retaining plate, and adapted to be secured at its opposite side to the cover. On no sustainable theory of the construction and operation of the McMillan devices do they infringe this claim. It is true that those devices are fastened to the cover of a book by a strip of cloth, and that such strip is inserted between two of their plates; but it is not inserted, as the patent says it shall be, between the back plate and the retaining plate, but is placed between what corresponds to the back plate of the patented device and another plate or strip which McMillan fastens on the back of such back plate.

The complainant's expert says that this additional plate or strip is also a retaining plate. It unquestionably retains some things, as, for example, the strip of cloth in question; but it does not keep the back plate and the hook carrying plates together, which is the primary function of the retaining plate of complainant's patent. That work in defendant's devices is done by a plate which is the precise equivalent of the retaining plate of the patented device; but the strip of cloth does not pass between the back plate and this retaining plate. It is very old to fasten one thing to another by a strip of cloth. Complainant has no right to monopolize any other way of doing this than that claimed in his patent. The range of equivalence is very narrow. McMillan does not infringe the tenth claim of the patent in suit.

The first claim is for the combination of—

"a plurality of interlocking hook-carrying plates adapted to hold the hooks in an open or closed position, a spring plate engaging the hook plates and adapted to secure them from accidental movement when the hooks are in an open or closed position, and means for reliably holding the hook plates and the spring plate together."

It is not necessary to consider particularly claims 2 to 9. If claim 1 is valid and infringed, so are they.

Two different devices, made and marketed by McMillan, are alleged by complainant to infringe. Each of them has a retaining plate. Each of them has what appears to be a back plate. McMillan says, however, that this back plate is not such as that described in the patent in suit, in that it is not a spring plate and does not in any wise perform the functions thereof. According to the McMillan's contention, its back plate is simply a holding or retaining plate, and serves no other purpose. How far this contention is well founded will be presently considered. The eye can readily detect certain differences between the hook plates of complainant's patent and the hook-carrying members of either of McMillan's combinations. In one of these there are hook plates; but each of them is slotted in such fashion that there is a narrow strip of metal between the slot and that one of its longitudinal edges which comes in contact with the companion plate.

McMillan says that, although these hook plates are fitted into the back plate, the springlike action which holds the hooks in their open or in their closed position, as the case may be, is given by that narrow strip of metal in the hook plates themselves which lies between the slots and their longitudinal edges. In the other form of device McMillan, instead of two hook plates, uses three wires. On each of

these wires are C-springs mounted in such fashion that the spring on each outer wire presses against and coacts with a spring on a central wire. These springs admittedly give the hingelike action of complainant's device; but according to the McMillan they, and they alone, furnish also all the spring action by which its device is made operative. .

Complainant says that, even if so much be granted, each of the devices infringes upon its patent. It claims that, whether the springlike action is the result of the slot in the one device or of the C-spring in the other, they each work in an equivalent way, by the use of equivalent means, · to produce the same result as that described in complainant's patent. This contention cannot be sustained. Complainant did not claim to have discovered that in books of this character springlike action of this kind might be useful. That was well known before his day. Whether he could have worded his claims more broadly than he did is a question not before this court. In every one of his claims he has the spring plate as one of his essential elements, and separate hook-carrying plates as another. The claims of complainant's patent cannot be read upon any device which does not contain such spring plates.

Complainant says that even so the McMillan devices infringe, because in each of them there is a spring plate which holds the hook plates and exerts upon them the characteristic springlike pressure. Whether the complainant is right in this connection is a sharply contested question of fact. The McMillan says it makes its plate out of stiffer and less resilient metal than that used by the complainant. Any possible springlike capabilities that such a back plate may have are further reduced by putting upon its back another metal plate or strip which, as before explained, serves to hold the cloth which fastens the device to the cover. It admits that there is a springlike action in each of its devices, but says that in one of them such action is produced by the slotted edges, and in the other by the C-springs, and by those edges and springs alone.

Complainant points out that the McMillan says in effect that it uses a back plate; that this back plate would very well work as a spring, but that it takes pains to keep it from doing so, and thus goes to quite an appreciable amount of trouble and expense to supply the springlike action in another way, all of which would be altogether unnecessary if the back plate were allowed to do its natural work. That may be true. · I think it is. But the complainant has the sole right in a combination of this character to use the back plate as a spring plate. It has appropriated the straight and easy road to the desired goal; but, if it has not validly claimed a more precipitous and less convenient bypath, the McMillan may take the latter, if it will.

The real question in the case is whether the McMillan back plate is not also a spring plate. Its hook plates in either form, whether of wires or slotted plates, are the equivalent of the hook plates of the patent in suit, the claims of which may be read upon them. The evidence shows, I think, that either McMillan's slots or McMillan's C-springs will give sufficient spring action. But it also shows that its back plates operate as spring plates, and would do the work without the use of either the slots or the C-springs. It is not entitled to use

complainant's combination, even although it has added something to it, so long as the former continues to operate as complainant intended it should. In other words, McMillan cannot use complainant's spring at all. Whether it also uses another is immaterial. Nor does the fact, if it be such, that McMillan uses but a small part of the power which it might get from complainant's form of spring, acquit it from the charge of infringement, provided it does use some of that power, as the evidence satisfies me that it at least sometimes does.

[2] It follows that the complainant is entitled to a decree that its patent is valid, and that each of the two McMillan devices infringes the first nine claims (but that neither infringes the tenth claim) thereof, and for an injunction and accounting against the McMillan, which must pay costs incurred since the date of its intervention. There can be no decree against the Twinlock.